```
 1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF MICHIGAN
 2                           SOUTHERN DIVISION

 3      _____

 4      UNITED STATES OF AMERICA,

 5                       Plaintiff,

 6           v.                          CASE NO:  1:19-CR-118

 7      AARON WILLIAM FEIN,

 8                       Defendant.

 9      _____/

10

11                               *   *   *   *

12                           SENTENCING HEARING

13                               *   *   *   *

14

15      BEFORE:     THE HONORABLE PAUL L. MALONEY
                    United States District Judge
16                  Kalamazoo, Michigan
                    March 4, 2020
17

18      APPEARANCES:

19      APPEARING ON BEHALF OF THE PLAINTIFF:

20           NILS KESSLER
             Assistant United States Attorney
21           P.O. Box 208
             Grand Rapids, Michigan  49501-0208
22

23      APPEARING ON BEHALF OF THE DEFENDANT:

24           JAMES STEVENSON FISHER
             Federal Public Defender
25           50 Louis Street, N.W., Suite 300
             Grand Rapids, Michigan 49503-2633
```

|  |  |  |
|---|---|---|
| | 1 | Kalamazoo, Michigan |
| | 2 | March 4, 2020 |
| | 3 | at approximately 9:05 a.m. |
| | 4 | PROCEEDINGS |
| 09:05:59 | 5 | THE COURT:  This is File Number 19-118; The United |

THE COURT:  This is File Number 19-118; The United
States of America vs. Aaron Fein.  This matter is before the
Court for sentencing.

The Court's file reflects that on July 19, 2019,
the defendant pled guilty before this Judge to false
statement, contrary to 18 U.S. Code 1001(a)(2).  The Court
accepts the plea agreement finding the charges pled to
adequately reflect the seriousness of the offense behavior.

The Court's presentence officer scored this case at
Offense Level 13, Criminal History Category I, resulting in
an advisory guideline range of 12 to 18 months.  The
defendant has two objections to the scoring of the
guidelines, which the Court will address momentarily, after
argument from the parties.

The record should reflect that Assistant United
States Attorney Nils Kessler represents the government.
Attorney James Fisher represents the defendant.  The
defendant is present in person.

Mr. Fisher, have you had ample opportunity, sir, of
reviewing the pre-sentence report with your client?

MR. FISHER:  Yes, your Honor.

1             THE COURT:  Subject to your objections, do you

2     concur that the guideline range is 12 to 18 months?

3             MR. FISHER:  Yes, your Honor.

4             THE COURT:  Thank you.

09:07:12   5             Mr. Fein, is that true, sir?  You've had ample

6     opportunity of reviewing the presentence report with your

7     lawyer?

8             THE DEFENDANT:  Yes.

9             THE COURT:  And are you satisfied with his work and

09:07:21  10     representation of you?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Thank you, sir.

13             Mr. Kessler, do you concur in the advisory

14     guideline range?

09:07:28  15             MR. KESSLER:  I do, your Honor.

16             THE COURT:  Are you moving third level?

17             MR. KESSLER:  Yes, your Honor.

18             THE COURT:  That motion is granted.  That does not

19     change the advisory guideline range, because the Court

09:07:35  20     anticipated the making of the motion, and the Court's

21     granting of it.  Of course, that's all subject to the

22     objections.

23             So with that, Mr. Fisher, your objections, sir.  Go

24     ahead.

09:07:47  25             MR. FISHER:  Yes, your Honor.  As I've outlined in

my objection letter and in my sentencing memorandum, we do
have the two objections as noted by the Court.

The first one, the 2B1.1(b)(9)(C) enhancement for
violation of the prior specific judicial or administrative
order injunction, decree, or process not addressed elsewhere
in this guidelines enhancement.

As I noted in my objection letter and in our
sentencing memorandum, the notes that accompany this portion
of the sentencing guidelines appear to indicate, and the
caselaw I think would support the argument that I've made
here, which is that the violation actually has to be the
criminal conduct, not just some lengthy established offense
conduct that's defined here, but the actual crime itself.
And the cases that would support that I've cited in my
motion.  There are no cases that support an interpretation
like this and, in fact, I couldn't find a single case
addressing this enhancement 401.001 violation, so we don't
have much in the way of precedent to go on here.  What we do
have is cases that show that the application applied in
fraud cases where a court specifically ordered somebody not
to do the thing that was the crime.  And in the case, I
believe it was Johnston, that was phen phen cases from
several years ago out of Kentucky, in this case, the Court
had ordered the defendant to disburse a settlement and he
devised an artifice to defraud the very object of the

1    Court's order.

2         In Ramer, the same issue applied.  The offense

3    involved the violation of a prior temporary restraining

4    order in this case.  Here we have a Probate Court ordering

09:09:30  5    Mr. Fein not to use or possess firearms he temporarily

6    possessed firearms.  That Court order is not the false

7    statement here.  So we have a distinction here in the case

8    that I think is a meaningful one, and the application notes

9    would seem to suggest that this applies to a specific fraud

09:09:48  10   on the Court rather than merely violating any Court order at

11   any time during the relevant conduct involved in the case.

12        THE COURT:  There is nothing in the text of the

13   guideline that limits this enhancement to just fraud cases,

14   is there?

09:10:03  15        MR. FISHER:  I would agree with that, your Honor.

16        And I understand we are out on a bit of a unique

17   ledge here, there is not much in the way of precedent to

18   define the issue.

19        THE COURT:  That's true.  Okay.  Thank you, sir.

09:10:15  20        MR. FISHER:  The next issue--

21        THE COURT:  Let's do them one at a time.

22        Mr. Kessler, on this objection, go ahead, sir.

23        MR. KESSLER:  Yes, your Honor.

24        I think that you just touched on what is the most

09:10:25  25   important part, is that the plain language of the

1   enhancement says you get two levels if the offense involved

2   a violation of a prior judicial order.  And involved, I

3   think, is the most important word there.

4        As to the two sub-arguments here; first, that it

09:10:38  5   applies only to financial fraud, the language means what it

6   says, and it doesn't say financial in there and the language

7   itself of the enhancement doesn't use the word fraud either.

8   I understand that there are cases where it is applied to

9   financial fraud cases, that's no surprise, but none of those

09:10:54  10   say that it applies only to financial fraud cases.

11        I think it's important that the sentencing

12   commission, acting as an arm of Congress here, indexed the

13   1001 crime to Section 2B1.1, which means they meant for this

14   guideline to apply to 1001 cases, and that implies that they

09:11:13  15   meant for all the possible enhancements under 2B1.1 to apply

16   to these cases.  They know how to say otherwise if they mean

17   to say otherwise, and they didn't.

18        THE COURT:  2B is a, to use a pejorative term, a

19   great garbage bin for a lot of offense of convictions.

09:11:30  20        MR. KESSLER:  It is.

21        THE COURT:  When to a certain extent I think the

22   original sentencing commission couldn't figure out where to

23   put them--

24        MR. KESSLER:  I like to think of it as a multi-tool

09:11:42  25   as opposed to a garbage bin.

1          THE COURT:  As a result of that, there are all

2     kinds of factual scenarios involved in the application of

3     this particular guideline.  But you would agree with Mr.

4     Fisher, and Mr. Fisher argues, of course, that most of the

09:11:56   5     caselaw involves financial crimes, for obvious reasons,

6     because that's where financial crimes go.

7          MR. KESSLER:  I do agree.  And I also agree that I

8     was not able to find any cases where it was actually applied

9     to this, but that doesn't mean that it shouldn't or that it

09:12:10  10     can't.

11          And as to the second part of the, you know,

12     argument that Mr. Fisher is making, essentially saying that

13     the lying itself had to be the violation of the order, but

14     that again, is not what the plain language says.  It says

09:12:23  15     that the offense of conviction had to involve a violation of

16     the prior judicial order.  He is lying about shooting a gun

17     and about having a gun, and having guns is what the prior

18     judicial order was about.  It involved having guns.  I think

19     it's important for to us look at what the purpose of this

09:12:40  20     is, and it actually spells it out in that same application

21     note; the purpose of this enhancement is to recognize that a

22     defendant who fails to comply with such order demonstrates

23     aggravated criminal intent.  So we have to ask ourselves if

24     that is the issue in this case, and I would say it is here.

09:12:56  25     A defendant like Mr. Fein who was not under a prior judicial

1    order not to have guns, would be less culpable than somebody

2    who did what he did.  A judge told him you can't have guns.

3    After a mental health evaluation, they basically said this

4    is dangerous, you should not have guns, and he went out and

09:13:13  5    got guns, and was shooting them, and was trying to make one

6    in his own ^ house ^ how is ^ how's, and then he lied about

7    it.  And that is clearly involved in the offense.

8              THE COURT:  Mr. Fisher?

9              MR. FISHER:  Briefly, your Honor.

09:13:23  10              THE COURT:  Yes, sir.

11              MR. FISHER:  In terms of precedent, I would also--

12    I didn't do this in my memo, but I would point to the

13    opinion that I attached to this case where 1001 was the

14    count of conviction.  The Stone case that I've referenced in

09:13:37  15    my memo.  In that case, there was no application of this

16    particular enhancement where I think it would apply.  There

17    were several judicial orders in that case that were violated

18    during the pendency of that case, and the government in that

19    case, did not argue for the enhancement.  So we do have some

09:13:49  20    precedent that that application of that enhancement

21    shouldn't apply even when there are direct prior judicial

22    orders during the pendency of a case.  That would be my

23    response argument.

24              The other argument I would have is there are

09:14:02  25    several sections in 2B1.1 that I don't think can reasonably

1    apply to the context of a false statement to a law

2    enforcement officer.  If the law exceeded $550 million these

3    are all clearly defined as financial issues.  I think the

4    Court has identified the problem we have with 2B1.1 cases,

09:14:23  5    is the guidelines don't specifically address this case or

6    this kind of conduct.

7         Thank you.

8         THE COURT:  I certainly concur with that.  And the

9    use of the 2B1.1 guideline in this particular circumstance

09:14:37 10    doesn't quite fit, and the Court is left with applying the

11    guideline as it is.  Based on the facts of the case, this is

12    obviously a fact intensive analysis that's required here.

13         I'm going to overrule the defendant's objection on

14    this objection.  The Sentencing Commission prescribed the

09:15:02 15    guideline for 2B1.1 for violations of 1001, which is the

16    count and crime of conviction.  Therefore, in the absence of

17    authority to the contrary, it's presumed that the guideline

18    applies to this case, not just financial crimes, as the

19    defendant has suggested.  Recognizing, of course, Mr. Fisher

09:15:26 20    is absolutely accurate, that most of the caselaw involved

21    here is in the context of financial crimes.

22         Further, the application note supports the

23    application of the enhancement to this scenario.  The

24    application note states that the enhancement should apply if

09:15:42 25    a defendant commits a fraud in contravention of a judicial

order.  Fraud by definition includes the knowing concealment

of material fact.  That's Black's Law Dictionary 11th

Edition 2019.

In this case, the offense conduct, the defendant

made a material false statement to conceal his possession of

firearms, which was conduct prohibited by the judicial

order.  Accordingly, the Court finds that the guidance from

the application note lends itself to the ultimate

application of this particular enhancement.  Accordingly,

the objection to this enhancement, which is Paragraph 55 is

overruled.

And now let's move to 56.  Go ahead, Mr. Fisher.

MR. FISHER:  Your Honor, I think we are a little

bit on stronger footing with this objection.  Probation, I

think, included this enhancement for the possession of a

firearm in connection with the offense, and the guidelines

provided for, "If the offense involved possession of a

dangerous weapon including a firearm in connection with the

offense."  We don't have any defining language in 2B1.1, but

we do have defining language of "in connection with" in

other parts of the guidelines.  And in caselaw that's

developed dealing with that in the context of firearms in

drug cases.  What we have there is the gun has to somehow

facilitate, augment, or encourage, or induce, or embolden

the person to commit the underlying offense.  Here the gun

1    was possessed at a shooting range a day before the false

2    statement was made.  There's absolutely no way that he could

3    have been emboldened by the possession of the firearm.  The

4    facts themselves don't support that he was emboldened,

09:17:25  5    encouraged, induced or in any way emboldened to make a false

6    statement.

7            The recording we played during the motion to

8    suppress, if the Court recalls, is profuse with Mr. Fein's

9    essentially begging that he not go back to a mental health

09:17:37  10   facility.  The false statement here was designed

11   specifically to help him in that narrow sense avoid being

12   sent to a mental health facility again.  There is no

13   indication whatsoever the gun assisted or facilitated that

14   false statement or any false statement in this case.

09:17:52  15           So when you look at the lack of definition in 2B1.1

16   and the definitions that we do have in the other sections of

17   the guidelines, there has to be some sort of nexus between

18   the actual crime and the gun, not merely that the lie or

19   false statement of a fraud was about a firearm, but that it

09:18:11  20   actually encouraged, induced, facilitated, or otherwise

21   emboldened the defendant to commit the crime itself.  We

22   just don't have that here.  The application, I believe, is

23   clearly inapplicable.

24           THE COURT:  Thank you, counsel.

09:18:22  25           Mr. Kessler.

1           MR. KESSLER:  Yes, your Honor.

2           I think we are going through the same exercise here

3      where we have to go back again first to looking at the

4      specific words of what the enhancement says, and it says "in

09:18:35   5      connection," not facilitating.  And Congress and the

6      Sentencing Commission know how to say facilitating if they

7      mean it.  So what we have here is trying to interpret it

8      based on some caselaw, and I grant there is a case at least,

9      the Gibbs case, from out of circuit where it applied it in a

09:18:51   10      case where it was facilitating.  And even if you read Gibbs

11      to say it had to facilitate, Gibbs itself recognized that

12      there are other circuits that disagree.  For example, in the

13      Bennett case, the Court specifically came out and said it

14      does not have to facilitate it.  So I don't think that you

09:19:06   15      can read it into the language just because you want to.  I

16      think the best example that I was able to find of an example

17      where it clearly didn't have to facilitate it was the Greig

18      case, which as Mr. Fisher pointed out when we were talking

19      about it before, actually involved Whitey Bulger case.  I

09:19:22   20      hadn't noticed it the first time I looked at it.  But the

21      facts of that one are interesting in that the defendant was

22      Whitey Bulger's girlfriend, and she was convicted of

23      harboring Whitey Bulger, and the enhancement applied even

24      though she didn't have guns, Whitey Bulger had guns.  Now,

09:19:38   25      you can argue that having guns emboldened and facilitated

1    Whitey Bulger in staying hidden, or in fighting off the

2    police if they had come to find him, for example, but they

3    didn't facilitate his girlfriend harboring him or hiding

4    him.  The fact is, the Court said, they were connected to

09:19:53  5    the offense.  So I agree with Mr. Fisher, there has to be a

6    nexus, and there is a nexus.

7         THE COURT:  Isn't that somewhat like a fortress

8    theory though?  I mean I apply fortress theory possession of

9    weapons in drug houses all the time.  In this case, we have

09:20:07  10   got-- in the Whitey Bulger case, we have got possession of a

11   firearm at a place where a fugitive is being lodged,

12   correct?

13        MR. KESSLER:  Agreed.  And it's a necessary, but

14   not sufficient-- or sufficient but not necessary condition.

09:20:20  15   For Whitey Bulger, yes, you could say it furthered his

16   crime, but I'm not seeing how it would have furthered his

17   girlfriend's crime in not telling the police where he was.

18   It was connected to it is the issue.  Again, you go back to

19   what is the intent of the people who wrote this enhancement,

09:20:36  20   and it's to recognize that somebody who brings a firearm to

21   some other sort of crime is making it more serious.  The

22   guidelines are all concerned, not like with a 924(c) where

23   you're trying to decide whether a statute applies.  The

24   guideline are concerned with determining what is an

09:20:52  25   appropriate sentence.  And so this enhancement is there to

say, you know, when somebody brings a gun to another crime,
they are more culpable.  They are more dangerous.  It has to
be taken into account in setting what the guideline range
is.  And in that case, yes, there was a nexus, but it wasn't
in furtherance.

I don't know if you want me to address there's--
If you have other questions on that.

THE COURT:  No, go ahead.

MR. KESSLER:  I want to touch on, and Mr. Fisher
didn't talk about it here at the podium, but it's in the
sentencing memorandum, so I wanted to touch on the other
part of it.  And if the defense is withdrawing this, I can
cut it short.  There was an issue about whether it was
actually a firearm that he had.  I don't know if the
defendant is persisting with that, at least in the
sentencing objection.

MR. FISHER:  Just to clarify.  That has to do with
Count Two that was dismissed in exchange for the plea.  It
was more relevant conduct than this specific allegation.

MR. KESSLER:  If there isn't really any argument--

THE COURT:  I think the gun we are talking about is
the gun at the firing range in Ann Arbor, correct?

MR. KESSLER:  Well, there is both.  The one--  They
are both relevant conduct, whether it's dismissed or not.
And the caselaw is pretty clear on that.

1          The one he was firing in Ann Arbor, clearly a

2    firearm.  On video you could see him shooting it.  To the

3    extent there's any argument about the other one, it may not

4    be a firearm for regulatory purposes, and I'll just put on

09:22:12  5    the record that I talked with Brian Lutke, who the Court

6    might remember from past cases, he used to be an agent here,

7    and he's in charge of the National Firearms Center now in

8    West Virginia.  I sent him pictures of this gun, and he

9    agreed, it's the lower receiver in the unmilled state that

09:22:27 10    it's in would not be a firearm for regulatory purposes.  But

11    for guideline purposes, it could be readily converted into a

12    weapon, and it says so right on the box.  It says that with

13    tools that you can find around your house you could make

14    this into a functional weapon in under an hour.  And this

09:22:42 15    defendant we know has an engineering degree, and has

16    probably more skill and ability to do that than the average

17    bear.  So it doesn't sound like we are really arguing about

18    that.

19          I don't know if the Court had anything else on

09:22:53 20    that.

21          THE COURT:  I do not.  Thank you.

22          MR. KESSLER:  Thank you, your Honor.

23          THE COURT:  Mr. Fisher, anything else on this

24    issue?  Go ahead, sir.

09:22:57 25          MR. FISHER:  Just to clarify a couple points.  Mr.

Fein's engineering degree is in industrial engineering,

which is more properly defined as efficiency and processes

involving people rather than machinery.  I think that's an

important distinction to make.

09:23:11        To address the government's argument about the

firearms parts.  I don't think that something that can be

milled by a person with limited expertise or skill in a

manufacturing process meets the definition of readily

convertible, which is why I didn't even bother addressing it

09:23:27  with the Court.  I think it's sort of a tertiary issue to

what we are dealing with here.  What I think primary issue,

the possession of the firearm I think the primary issue is

the possession of the firearm, and I think Mr. Kessler's

statement is indicative of our position, Mr. Fein did not

09:23:37  bring this gun to the crime.  The crime came to the gun, and

the government's trying to put the cart before the horse and

say that this is all part and parcel of the same thing, when

it's not.  The crime occurred after the possession of the

gun, not before it or not during it, and therefore, the

09:23:53  application shouldn't apply to these facts.

        THE COURT:  Thank you, sir.

        MR. FISHER:  Thank you, your Honor.

        THE COURT:  This is again an issue which our

circuit has not addressed.  Other circuits in other contexts

09:24:06  have addressed this particular issue.  But in the Court's

1    judgment, application of this enhancement is a bridge too

2    far.  I'm going to sustain the defendant's objection to the

3    application of 2B1.1(b)(16)(B).  The Court recognizes

4    contrary authority in other circuits, but for purposes in

09:24:38  5    the fact-bound analysis of this particular case, the Court

6    feels the Gibbs case is particularly relevant.  So I'm going

7    to sustain the defendant's objection to that application.

8          That exhausts your objections, correct, Mr. Fisher?

9          MR. FISHER:  That is correct, your Honor.  Thank

09:25:01  10   you.

11         THE COURT:  Counsel, if you could turn to Page 11

12   of the presentence report, and let's review where we are in

13   light of that-- those two rulings by the Court.

14         MR. FISHER:  Your Honor, may I use my laptop?

09:25:15  15   THE COURT:  Oh, sure.  You can tell the

16   generational difference between myself, who is dealing with

17   paper, and a lawyer who is, shall we say, slightly younger

18   than me, dealing with a computer.

19         MR. FISHER:  I've got my book as well, your Honor.

09:25:40  20         I think we are at Offense Level 9.

21         THE COURT:  Okay.  All right.  We have got a base

22   and I'm starting at Paragraph 54, we have a Base Level of 6.

23   We have got the application of Paragraph 55.  I overruled

24   the defendant's objection to that.  That gets us to Offense

09:26:01  25   Level 10, because of the directive if the resulting offense

level is less than 10, four levels are added, so that gets

us to 10.  I sustained the objection to 56.  The obstruction

objection gets us to 12.  And under those circumstances,

third level doesn't apply.  So the adjusted Offense Level

09:26:28  would be 12, after acceptance, it becomes 10.  So the

guideline range after the disposition of the defendant's

objections becomes 10/I.  And let me see if the parties

concur.

MR. KESSLER:  I do, your Honor.

09:26:50  MR. FISHER:  I do as well, your Honor.

THE COURT:  All right.  Thank you.

That makes the advisory guideline range six to

twelve months.

The Court's had the benefit of the government's

09:27:08  sentencing memorandum, which is ECF 65, the defendant's

sentencing memorandum at 66.  The Court has also reviewed

the report from the mental health professionals of the

Bureau of Prisons as well as the other documentation which

has been attached to everyone's memos.

09:27:32  So with that, Mr. Kessler, allocution on behalf of

the government.

MR. KESSLER:  Yes, your Honor.  Thank you.

Well, we have all seen how often this sort of thing

comes up, often and more tragic circumstances nowadays.  So

09:27:46  we all know that when all of the signs are there that

somebody is planning to commit a mass shooting or a bombing, we have to take it seriously.  And I think in a case where somebody is preparing, training, arming themselves, it's deadly serious, and that's what we have in this case.  This defendant repeatedly went out and tried to get semi-automatic weapons, actually got a Glock pistol at one point, tried to buy all the ammunition in a store at another point.  One semi-automatic assault weapon after another.  He was training at various gun ranges, trying to make a bomb at home.

Now, do we think he actually belongs to Al-Qaeda or espouses some sort of radical Islamic motivation just because he had that material?  No.  They just had the best schematics for a bomb out on the internet that you could get.  Do we think he's some kind of white supremacist because he asked his aunt to get him a copy of Mein Kampf?  Probably not.  But all the research shows people who want to commit mass shootings are looking for excuses or validation, some framework to make them think they are something other than a mad man who wants to hurt people.

We don't know exactly what the motivation was.  We do know he was interested in committing an act of mass violence.  He researched it constantly, talked about it with people who have interviewed him, and then he was going out and was actually preparing to do it.

1          Now, the defense has said that this is basically a

2     thought crime.  They said he had no criminal history, so

3     can't hold that against him.  And it was legal for him to

4     purchase a firearm.  I want to hit on each of those things.

09:29:17    5          First off, the idea that this just a thought crime,

6     that everything he did other than the actual lie at the end

7     shouldn't count against him.  The fact that either thoughts

8     as opposed to actions beforehand doesn't mean they are

9     irrelevant, and you can see that in all kinds of other

09:29:32   10     contexts.  It's perfectly legal, for example, to set up

11     offshore accounts in places like the Bahamas or whatever,

12     but it would be relevant in a case where somebody was

13     committing a financial fraud scheme.

14          Now, this guy is a college graduate.  He had no

09:29:46   15     criminal history, and it was legal for him to have guns.

16     All those things are true.  Again, they do not negate what

17     his intent was.  If you look at the cases like this where

18     things went wrong; Dylann Roof, 21 years old, close to the

19     same age as this defendant, no criminal history until he

09:30:02   20     shot ten people at a Charleston church with a legally

21     purchased firearm.  Nikolus Cruz, 21 years old, no criminal

22     history, until he shot 34 people at Parkland High School,

23     with a legally purchased gun.  Stephen Paddock, a successful

24     businessman, no criminal history, until he shot 500 people

09:30:21   25     from a window in Las Vegas, with legally purchased guns.

1    And finally, Timothy McVeigh, decorated veteran, no criminal

2    history, until he blew up the federal building in Oklahoma

3    City.  The public was never harmed up until then, that's

4    true.  And it's true in every one of these cases, until it

09:30:37   5    wasn't.  And in this case, the public wasn't harmed because

6    the FBI had to follow him around for months.  They had a GPS

7    tracker on his car.  They had people driving around

8    following him, watching him everywhere he went, and were

9    able to intervene at key moments like when he actually got a

09:30:54   10   Glock semi-automatic pistol.  That is why the public was

11   never harmed, not because he didn't mean it.  Now he is

12   saying at this point that he didn't mean to do it, and he

13   was never going to hurt anybody, but I know this Court's

14   been around a long time, we have heard that before.  People

09:31:09   15   have intent that is very different from what they say their

16   intent was when they are in here for sentencing.  Suddenly,

17   I was never going to do it.  I didn't mean it.  Do we trust

18   that?  Can we?  I think we have to look at his behavior, and

19   not the words he is saying at his sentencing when he's

09:31:25   20   motivated to downplay it.

21          Every time a federal firearms licensee refused to

22   sell him a gun, he went to another one.  He would go to

23   another town, if he got stopped.  He would go to another

24   state, if he got stopped.  Those are not the actions of

09:31:38   25   somebody who didn't mean to do anything.  That's an awful

1    lot of preparation and trouble to put yourself to if you

2    were just looking for attention.

3          When his training got stopped in the middle here,

4    he went to Ohio to try and find another place where he could

09:31:51  5    go shoot and train on a semi-automatic weapon.  When the FBI

6    kept getting in the way, and got him to surrender his gun,

7    he started making one in his basement, and he started making

8    a bomb in his basement.

9          The defense wants you to believe, and what he is

09:32:05  10   trying to say now, is that he was just looking for

11   attention.  Well, he got attention, that's true.  But a lot

12   of what he was doing is exactly the opposite of what you

13   would do if you were just looking for attention.  If you

14   want attention, you go on Twitter, and you start talking all

09:32:20  15   the time about what you are going to do.  You post it

16   on-line, you go talk about it in a public square.  He was

17   doing things surreptitiously, like trying to go to another

18   state to get firearms training, trying to go to another FFL

19   that hadn't blocked him yet to try and get a gun, and then

09:32:35  20   making weapons in the basement.  Those are not cries for

21   attention, that's trying to hide your preparations to go

22   ahead and actually do it.

23          Now, as to the fact that he admitted his conduct,

24   yes, he got acceptance of responsibility, because he

09:32:48  25   admitted lying to the FBI.  Pretty hard to get away from

that when he did it in front of a whole lot of officers and

agents. But he-- Has he really accepted what he has done?

And we can feel confident that he is not going to do it

again? I would say we really can't. And one of the

09:33:04 recordings that came up before from the jail was when he

actually said, and I cited this in my sentencing memo, when

he is talking to his aunt Sheryl, he just-- and I'll leave

out the curse words, but he basically said, "I don't

understand this. All I did was lie to them. What is the

09:33:19 big deal?" That's how he really feels. He understands he

lied to the FBI and we could prove it, so he had to admit

it, but that doesn't mean that he has internalized that what

he was doing was wrong.

        Now, the defendant is arguing that supervision in

09:33:33 this case is enough. Just watching him, trying to make sure

that, you know, he stays on the-- stays on the path that's

going to be enough to protect public safety. The FBI was

following him around, as I mentioned, for months, with GPS

trackers on him, interviewing people he had interacted with,

09:33:51 and it still didn't stop him from going on and doing it

more. Probation doesn't have those kind of resources. As

hard as they work, and as talented as they are, they can't

sit on him all the time. Having him at home, that's where

he was making a gun, that's where he was making a bomb.

09:34:06 Putting a monitor on him to make sure he doesn't leave the

house, even that's not going to be enough, because that last

firearm he was making, he was making from parts he ordered

over the internet.  So unless they are going to intercept

and open all his packages, even that is not enough.

09:34:19   The only real guarantee that he is not going to

hurt anybody for some considerable period of time is while

he is incarcerated, where he is also hopefully going to get

some mental health treatment and come to grips with what

he's done.  But that is the key 3553(a) factor here.

09:34:36   Now, I do think the nature and circumstances of the

offense and his characteristics are important as well.

Especially, I think, in light of, you know, some of the

objections we just dealt with.  I understand, you know, the

Court's ruling on not enhancing his sentence for the

09:34:50   firearm, based on the Gibbs case, but that doesn't mean we

can't consider it as part of the nature and circumstances of

the offense.  And I think it's still fair to say that it is

different if he had been lying about an insurance contract

or he had been lying about paying his taxes.  He was lying

09:35:07   about having and making guns that were intended for mass

murder, and I think that's important that we look at the big

picture here.

   The defendant would like to say this is just a

thought crime.  But again, that's not what we have here.

09:35:22   The public safety interest is really key, and it's always

just thoughts until somebody actually goes out and does it.
With this defendant, his acts show that what he was up to
was not just thoughts.  It demonstrated that he wanted to go
out and commit a mass murder.  And the evidence proves he
knows how to do it, and his preparations were under way.

Public safety demands, your Honor, he can be
somewhere where he can't hurt anyone for as long as
possible.

THE COURT:  Thank you, sir.

Mr. Fisher.

MR. FISHER:  Your Honor, the government can't foist
their multitude of failures in mass shooting cases or change
the law about firearms on the back of Mr. Fein's sentence.
Unfortunately, that is what they are tying to do here.  The
fact of the matter is that Mr. Fein lied to officers to
avoid being sent back to a mental health hospital.  He is
begging repeatedly on the recording, which I'm happy to play
for the Court, that he not be sent back to a mental health
hospital.  He is not lying to the officer to avoid detection
for planning a mass attack.  And the government wants you to
believe that he actually did intend and plan to, despite all
of the interviews, all of the conversations, all of the
discussions he had with multiple agents, where he failed at
any point to notify them of any plan to attack anybody.  The
worst thing he did in this case is engage in internet

1    trolling, which the Pope addressed on his ash Wednesday

2    speech as a persistent problem that our world has to deal

3    with.  Mr. Fein is not unique in being alienated and being

4    somewhat disappointed in his career prospects.  He is not

09:36:55  5    unique in saying inflammatory things on the internet.

6    Certainly that's a problem for all of us to deal with in

7    this technological age.

8         Mr. Fein lied to a law enforcement officer to avoid

9    being hospitalized in a place that he did not want to go.

09:37:10  10   He didn't lie because he was concealing his affinity for

11   people who felt alienated.  He admitted that every time he

12   was talked to by the border patrol, by FBI, by Homeland

13   Security, by the local tasks force agents.  He admitted to

14   them freely that he felt sympathy for people who were

09:37:28  15   alienated.  Your Honor, I'm a criminal defense attorney, my

16   job is to feel sympathy for people that are alienated.  Mr.

17   Fein never planned to attack anybody or hurt anybody.

18        THE COURT:  Well, that's what he asserts.  But what

19   actions did he take?  What about the purchase of the vice at

09:37:46  20   the Lowe's or Home Depot or wherever it was?

21        MR. FISHER:  I don't think there is anything

22   illegal or questionable about a person purchasing these

23   items.

24        THE COURT:  No.  In the context of everything else

09:37:54  25   that's going on in this case, Mr. Fisher, what impact, if at

1    all, do you think the purchase of the vice has, because the

2    vice is necessary to convert the other components that he is

3    already-- that he already has, right?

4            MR. FISHER:  Right.

09:38:12  5            THE COURT:  So what impact do you think that should

6    have?

7            MR. FISHER:  In all honesty, your Honor, I think

8    it's completely irrelevant.  I don't think it has any

9    bearing whatsoever on the facts of this case.  I think Mr.

09:38:21 10   Fein's ability to or plan to build a firearm, which may or

11   may not have developed prior to or after the Probate Court's

12   order, has no bearing on what he actually planned to do

13   here.

14           THE COURT:  What do you make of the jail recording

09:38:33 15   where he basically says, "What's the big deal about lying to

16   the FBI?"  Does that auger well for compliance moving

17   forward?

18           MR. FISHER:  Your Honor, I would attribute that to

19   largely to Mr. Fein's mental health issues that we are well

09:38:48 20   versed in after dealing with this case.  There are multiple

21   records, multiple conversations before he was ever charged

22   with any crime, and subsequent records indicating he has a

23   profound mental health disorder.  That statement came before

24   he even received treatment from the Bureau of Prisons, as

09:39:04 25   far as I'm aware.  And my understanding now is that Mr. Fein

is medicated.  He is compliant with the medication that was

recommended.  And aside from his transfer from Newaygo to

here which interrupted his medication, he is now in a much

calmer state.  People say things on jail recordings all the

time that I have to listen to, some of them are

inflammatory, some of them are blowing off steam.  Mr. Fein

may or may not be in the same state that he was in when he

made those statements.  My belief is that the medication and

the treatment he has received since making those statements

has had an impact on his ability to comport himself with the

requirements of the law.  That he understands now if the

Court orders any mental health treatment, orders any

medication to be taken, that he has to comply with those

requirements or he will be sent back to jail.  My option

here, my proposed solution to this case affords the Court

with ultimate latitude to re-sentence Mr. Fein to what the

government is suggesting, if Mr. Fein steps out of line one

time.  If he fails to take his medication, if he fails to go

to out-patient treatment, if he fails to go to in-patient

treatment, if he orders something he shouldn't order on the

internet, the Court can sentence him to the maximum extent

of the law, but to suggest that because of what the

government thinks he might be planning to do, he deserves a

five-year prison sentence, is a tragedy of justice, and I

cannot stress that any more than I am right now.  It would

be completely inconsistent with the proportionality

requirements of the sentencing guidelines and with the

actual offense conduct in this case, which again, was Mr.

Fein lying to avoid, at that time, being sent back to a

09:40:30  mental health facility.

THE COURT:  What do you make of the encryption of

the computer?

MR. FISHER:  After he had already been--

THE COURT:  In the context of everything else that

09:40:39  was going on?

MR. FISHER:  Your Honor, it's hard for me to

describe the weirdness and how I feel about these particular

facts.

At no time during the course of this investigation

09:40:50  was Mr. Fein doing anything illegal.  He is allowed to

encrypt his computer.  He is allowed to do all these things.

The government's investigation appears to have been spurred

merely by fear.  And I don't know what law he violated to

justify it, frankly.  I understand there are concerns here.

09:41:07  I understand people have done horrible things.  But

repeatedly during these conversations, Mr. Fein is giving

them access to his property, giving them access to his

computer, admitting his affinity for people with, I would

say dubious reputations, to say the least, and they have not

09:41:22  been cut off in any way.  Even if he encrypted his computer,

09:41:35

1   he was also giving them his cell phone, giving them his

2   laptop, and allowing them to image the entire thing.  So I'm

3   not sure that the fact that he had at some point encrypted

4   it really means anything.  He was at every turn turning over

5   the property until the Probate Court ordered him not to

6   possess firearms, which is the central issue that caused

7   this crime to happen in the first place.

8           I don't think that any of the tertiary issues the

9   government has identified as warranting concern are

09:41:48   10   justified, and I think the government's proposed solution is

11   inconsistent with the massive government intervention that

12   already occurred in this place.

13          I do believe that probation can handle managing Mr.

14   Fein's internet activity.  I believe they can manage

09:42:01   15   handling his cell phone activity.  They can manage handling

16   his mail.  Those aren't things that are too far beyond the

17   tools of the government.  And if this Court agrees with me

18   and sentences him to probation, one step out of line lands

19   Mr. Fein back in a prison, to the fullest extent that it's

09:42:16   20   available to the Court.  It's a just sentence.  It's a

21   reasonable sentence within the guidelines, I think at this

22   point, since he has already served that much time in prison

23   or in jail.

24          THE COURT:  This is new information regarding his

09:42:29   25   taking of prescribed medication.

1          MR. FISHER:  Yes, your Honor.

2          THE COURT:  When did that start?

3          MR. FISHER:  That started probably right around the

4     time he came back and I noted that he was not taking his

09:42:39  5     medication.

6          THE COURT:  Came back from the examination?

7          MR. FISHER:  Yes.  It would have been after the

8     PSI.

9          THE COURT:  Up until then, he wasn't taking

09:42:49 10     medication as prescribed, correct?

11          MR. FISHER:  That is correct, your Honor.  One of

12     his diagnoses is anti-social personality disorder with

13     schizoid features.  My understanding from dealing with

14     mental health disorders throughout my career, is that

09:43:00 15     schizophrenia, schizoid personality disorders,

16     schizoaffective disorders all have a host of co-occurring

17     symptoms, one of them is an inability to comprehend that you

18     need help.  He seems, in his, I think based upon his

19     intelligence and his ability to logically work through this

09:43:17 20     process with me, working together on this issue, has been

21     able to realize he needs to take this medication if for

22     nothing else than to address the concerns of the Court and

23     the concerns of probation while he is on any supervision.

24          THE COURT:  All right.  Thank you, sir.

09:43:31 25          MR. FISHER:  Thank you.

         1          THE COURT:  Mr. Fein, is there anything you wish to

         2   say in your own behalf, sir?  You may proceed as you wish.

         3          THE DEFENDANT:  First off, I just want to say I'm

         4   sorry that I made the false statement.  I'm sorry for my

09:43:55 5   behavior.  I didn't-- I never wanted things to end up like

         6   this.  I never wanted things to go this far.  I'm sorry for

         7   violating the Probate Court order.

         8          Usually I listen to people, and I didn't listen to

         9   the judge when he told me to not possess firearms and to

09:44:43 10  not-- and to take my medication and comply with treatment.

        11   I should have listened to him.  I would like to think that

        12   usually I respect what people say and I have the ability to

        13   listen to what they have to say, and that I'm respectful,

        14   and that I am able to defer to what they have-- they want me

09:45:12 15  to do when I think that they are right, and that I need to

        16   listen to them.

        17          THE COURT:  Have you concluded or did you want to

        18   go on?  Go ahead.  Take your time.

        19          THE DEFENDANT:  And I accept responsibility for the

09:45:55 20  crime, and I'm sorry.  You know, I didn't want-- I

        21   consistently didn't believe I needed to take medication, and

        22   then when I was in Newaygo, my lawyer was the one who

        23   convinced me to try taking the pills, and I am able to

        24   listen to what other people have to say and defer to them

09:46:26 25  when I feel like I don't have the solution or I don't know

1    how to solve the problem.  That's it.

2           THE COURT:  Have you concluded, sir?

3           THE DEFENDANT:  (Nodding.)

4           THE COURT:  He is nodding his head yes.

09:46:55  5           MR. KESSLER:  Your Honor, can I address one thing

6    he said?

7           THE COURT:  Sure.

8           MR. KESSLER:  I think it's noteworthy he said, "I

9    can conform my behavior to what other people want me to do

09:47:04 10  when I think they are right."  The Kent County court told

11   him not to have guns.  He did it anyway.  And the FBI told

12   him again and again and again not to have guns, and he went

13   ahead with it anyway.  I don't think we can take his word

14   for it.

09:47:17 15          THE COURT:  Anything else, Mr. Fisher?

16          MR. FISHER:  Your Honor, I can't stress enough,

17   when the FBI asked for his gun, he gave to them, at a time

18   when he was under no legal obligation to do so.  He has

19   conformed in every step except for the violation of his

09:47:30 20  Probate Court order with the requirements and confines of

21   the law.  That's what we have to deal with here today, the

22   law, not what we think Mr. Fein was going to do maybe.

23          THE COURT:  Thank you, sir.

24          It is the Court's duty to impose a sentence

09:47:42 25  sufficient but not greater than necessary to comply with the

purposes of sentencing set forth in 18 U.S. Code 3553(a).

The Court recognizes the guidelines are advisory to the Court, but I have taken the guideline into account as an initial benchmark or starting point when sentencing in this case.

I recognize I must make an individualized assessment based on the facts presented.  The guideline range is one of the array of factors warranting consideration.

I also fully recognize my discretion in determining an appropriate sentence as recognized by the United States Supreme Court in its decisions in <u>Booker</u>, <u>Kimbrough</u>, <u>Rita</u>, <u>Gall</u>, <u>Spears</u>, and the Sixth Circuit case of <u>Herrera-Zuniga</u>.

Pursuant to <u>Tapia vs. The United States</u>, at 131 Supreme Court 2382, the Court recognizes that imprisonment is not suitable for the purpose of promoting correction and rehabilitation.

I have considered all of the defendant's arguments in support of his request for a lower sentence.

The 3553 factors are the nature and circumstances of the offense and the history and characteristics of the defendant.  The sentence must reflect the seriousness of the offense; promote respect for law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the

1    defendant; provide the defendant with needed medical,

2    educational, and/or correctional treatment; the need to

3    avoid unwarranted sentencing disparity among similarly

4    situated defendants; any guideline policy statements that

09:49:08    5    pertain; and the kinds of sentences available to the Court.

6         First, as is obvious from this record, the Court

7    recommends that the defendant receive mental health

8    treatment and counseling while he is incarcerated.  That

9    seems to me is the absolute priority for the time that Mr.

09:49:32    10    Fein is going to be incarcerated within the Bureau of

11    Prisons, that he work with his mental health treatment

12    providers and come to understand the circumstances under

13    which he committed this offense.  The commission of the

14    relevant conduct, which I think has some major import in

09:49:54    15    determining a sentence in this case, and hopefully he can

16    come back to this community and be a law abiding citizen

17    while on supervised release.

18         The offense of conviction, of course, is a 1001

19    violation of Title 18.  The advisory guideline range is six

09:50:16    20    to twelve months.  The relevant conduct here is significant

21    involving, number one, defiance of a state court order,

22    which is properly evaluated, in the Court's judgment, by the

23    application of four levels to the base offense level.  Mr.

24    Fein was not deterred by inquiries by agents of the Federal

09:50:45    25    Bureau of Investigation.  The record reflects what I would

1    refer to as a dogged search for firearms when he was

2    prohibited from having them, "because he was told not to."

3    There were multiple attempts, the purchase of the kit and

4    the tools, especially the vice, to convert the parts that he

09:51:12    5    had already is particularly aggravating in the Court's

6    judgment, and aggravates the offense conduct as far as

7    relevant conduct is concerned.

8            In addition to that, we have got additional

9    obstructive behavior, soliciting a fellow inmate to make a

09:51:36   10    call to his aunt to destroy evidence or secrete evidence

11    and, of course, Mr. Fein probably wasn't thinking about it,

12    but that placed his aunt potentially, and his cellmate in

13    difficult circumstances vis-a-vis the Federal Bureau of

14    Investigation in terms of doing things that might be

09:51:56   15    obstructing an investigation. I'm not suggesting that

16    occurred, but the potentiality for it, when you make that

17    sort of request, is significant indeed. But given that

18    element, the Court finds that two levels for obstruction is

19    not sufficient. This is aggravating enough, in the Court's

09:52:18   20    judgment, that a departure, because two levels doesn't

21    adequately reflect the obstructive nature of the defendant's

22    conduct, and the seriousness of that behavior. In the

23    Court's judgment, that requires a departure upward two

24    levels from the advisory guideline range.

09:52:43   25            Possession of the firearm parts in conjunction

1    with-- for the purpose of constructing an AR-15, and the

2    defendant expressed an intention to do it, in that context,

3    the Court finds that that conduct which in the Court's

4    judgment is relevant conduct for the Court to consider, is

09:53:08   5    not taken into the guidelines as scored.  Accordingly, a

6    departure pursuant to 5K2.0(a)(2)(B) is appropriate, and the

7    Court intends to depart upward two levels for that reason

8    also.

9         Now, as far as the 3553 factors are concerned,

09:53:33  10    specific deterrence of Mr. Fein is a significant factor for

11    the Court to consider here.  I recognize he might be in a

12    different place, based on the good advice he has gotten from

13    Mr. Fisher, and the fact that he is now understanding his

14    need to take medication, but specific deterrence of Mr. Fein

09:53:59  15    is a significant factor for the Court to consider.  At this

16    point in time, the Court views him as a significant risk to

17    the public.  And in addition to that, the Court must fashion

18    a sentence which promotes respect for the law, provides just

19    punishment, and reflects the seriousness of the offense

09:54:20  20    behavior, as well as relevant conduct.

21         Fortunately for Mr. Fein, he's got support in the

22    community from his aunt who raised him.  And hopefully he

23    will lean on those pro-social individuals when he is

24    released from confinement.  But given the nature of the

09:54:46  25    relevant conduct here, the Court believes that a variance

upward of two levels is also appropriate for the reasons

that I have-- for the reasons that I have stated.

Accordingly, the Court finds after the departure

applications and the variance application, that the

appropriate guideline range is properly evaluated at Offense

Level 16, Criminal History Category I, which results in an

advisory guideline range of 21 to 27 months.  And it's the

Court's intention to sentence Mr. Fein at the top end of

that range, considering the nature and circumstances of the

offense, the history and characteristics of the defendant,

and the other factors that the Court has laid out on this

record.

Accordingly, it's the judgment of the Court the

defendant is committed to the custody of the Bureau of

Prisons for a term of 27 months.

Upon release from imprisonment, the defendant shall

be placed on supervised release for a term of three years.

Within 72 hours of release from custody of the

Bureau of Prisons, the defendant shall report in person to

the probation office in the district to which he is

released.

While on supervised release, the defendant shall

comply with the mandatory and standard conditions of

supervision, including DNA collection and drug testing.

Additionally, the defendant shall comply with the following

1    special conditions of supervision:

2            Participate in a program of mental health treatment

3    as directed, and follow the rules of the program until such

4    time as he is released from the program by his probation

09:56:22  5    officer, and pay at least a portion of the cost according to

6    his ability to pay, as determined by his probation officer.

7            He is not to possess any firearm.  He is not to

8    have any components of a firearm or components to make

9    explosives while he is on supervised release, and he is not

09:56:45  10    to possess any component of any dangerous weapon while he is

11    on supervised release.  It is the Court's intention here to

12    write a condition of supervised release, which is broader

13    than just a reference to firearm, components of firearms,

14    anything having to do with explosives, the defendant is

09:57:12  15    prohibited from possessing.

16            If he is unemployed after the first 60 days of

17    supervision or for 60 days after termination or layoff from

18    employment, he must perform at least 20 hours of community

19    service per week as directed until he is gainfully employed

09:57:29  20    full-time.

21            He will be monitored on home detention for the

22    first 12 months of supervision.  During that time, he must

23    abide by all technological requirements, location monitoring

24    program rules, and pay all or part of the cost of

09:57:44  25    participation in location monitoring program, as directed by

his probation-- by his probation officer.

He is restricted to his residence at all times except for employment, education, religious service, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court ordered obligations, or other activities as pre-approved by his probation officer.

He must use only computers and computer-related devices which are approved in advance by his probation officer.

He must provide his probation officer with all user names, email addresses, passwords, social media accounts, and other forms of internet identification, and must not create additional accounts unless approved in advance by his probation officer.

He must participate in the computer internet monitoring program, and must comply with the rules of the program as directed by his probation officer.

He must pay the cost of computer monitoring, as directed by his probation officer, and advise anyone in his household or any business entity that he might have contact with, that the computers may be subject to computer monitoring.  He must provide all computer related billing records, including but not limited to telephone, cell phone, cable, internet, as directed by his probation officer.

1    Refusal to comply will be a violation of supervision.  He

2    must warn anyone with whom he shares a residence that the

3    premises is subject to search pursuant to this condition.

4         He must submit his person, property, house,

09:59:16  5    residence, vehicle, papers, computers, and other electronic

6    devices to a search conducted by the United States Probation

7    Office.  Failure to submit to a search may be grounds for

8    revocation of release.  He must warn other occupants of the

9    premises where he lives or works that the premises is

09:59:31  10   subject to search pursuant to this condition.  The probation

11   officer may conduct a search under this condition only when

12   reasonable suspicion exists that he has violated a condition

13   of supervision, and that the areas to be searched contain

14   evidence of the violation.  Any search must be conducted at

09:59:48  15   a reasonable time and in a reasonable manner.

16        The special assessment of $100 is ordered due and

17   payable immediately.

18        The Court does not intend to impose a fine in this

19   case.

09:59:59  20        Mr. Fisher, any other recommendations to the Bureau

21   of Prisons that you would like?

22        MR. FISHER:  Your Honor, I would ask that the Court

23   send Mr. Fein to Butner.  He has already got treatment there

24   or closer mental health treatment facilities he can

10:00:14  25   maintain--

                    THE COURT:  I'm not picking you up, sir.  I'm

sorry.

                    MR. FISHER:  Sorry, your Honor.

                    Mr. Fein was previously housed at Butner, which is

a mental health facility in North Carolina.  I think he

would like to be housed closer to his family so they can

visit him.  I'm not sure if there's one closer besides

Chicago.

                    THE COURT:  I view the mental health recommendation

as the absolute first priority here, so I'll put close to

home as possible, but I'm going to clearly make it part of

the judgment that I believe that the mental health placement

is the most important.

                    Mr. Fisher, any legal objection to the sentence

imposed, other than those already placed on the record?

                    MR. FISHER:  Your Honor, there were two points that

I didn't catch.  I did catch two points for the vice and two

points for the further obstructive behavior.  What was the

third?

                    THE COURT:  The variance upward considering the

3553 factors.

                    MR. FISHER:  Okay.  Your Honor, we would object to

the upward variance in this case, the 3553 factors, the

guidelines, and the obstructive conduct.

                    THE COURT:  Thank you, sir.

|  | 1 | Are you satisfied that I have addressed all of your |
|  | 2 | arguments? |
|  | 3 | MR. FISHER:  I am, your Honor. |
|  | 4 | THE COURT:  All right.  Thank you. |
| 10:01:21 | 5 | Mr. Kessler, any legal objection to the sentence |

                    Are you satisfied that I have addressed all of your

               2    arguments?

               3            MR. FISHER:  I am, your Honor.

               4            THE COURT:  All right.  Thank you.

10:01:21       5            Mr. Kessler, any legal objection to the sentence

               6    imposed?

               7            MR. KESSLER:  No.  I just want to clarify this.  I

               8    think Mr. Fisher and I might be thinking the same thing.

               9    Just for the record, I expect Mr. Fisher to appeal, those

10:01:31      10    first two were guideline departures and then the last two

              11    essentially a variance of the equivalent of two levels?

              12            THE COURT:  Correct.

              13            MR. KESSLER:  Is that what the Court's saying?

              14            THE DEFENDANT:  Correct.  I tried to make that

10:01:42      15    clear but.

              16            MR. KESSLER:  Well, we said two levels, and I can

              17    see him maybe coming back saying the guideline range was now

              18    21 to 27.  There is difference between departure versus

              19    variance.

10:01:55      20            THE COURT:  Effectively I departed and I varied

              21    upward six levels to 16/I.

              22            MR. KESSLER:  Right.  But the last one equivalent

              23    of two levels?

              24            THE COURT:  Correct.

10:02:06      25            MR. KESSLER:  Thank you.

1              THE COURT:  You're welcome.

2              Mr. Fein, I advise you--

3              Oh, counts to be dismissed, Mr. Kessler?

4              MR. KESSLER:  Count Two, your Honor.

10:02:10    5              THE COURT:  Count Two is dismissed pursuant to the

6       plea agreement.

7              Mr. Fein, I advise you, sir, you can appeal your

8       conviction if you believe that your guilty plea was somehow

9       unlawful or involuntary, or if there is some other

10:02:20   10       fundamental defect in the proceeding not waived by your

11       guilty plea.

12              You also have a statutory right to appeal your

13       sentence under certain circumstances, particularly if you

14       think the sentence is contrary to law.

10:02:31   15              You have the right to apply for leave to appeal in

16       forma pauperis if you are poor.  If you wish to do so, with

17       a few exceptions, you need to file the appropriate documents

18       within 14 days of the entry of the judgment in this case.

19       Your attorney will prepare and file notice of appeal upon

10:02:45   20       your request.

21              Counsel is advised of his obligation to advise his

22       client of his appellate rights.  Should your client wish to

23       pursue an appeal, the forms for filing an appeal can be

24       found on this Court's website or the Court of Appeals'

10:02:57   25       website.  Should your client choose to appeal, you're

1    obligated to continue representation of him until such time

2    as you are specifically relieved by the Court of Appeals.

3            Anything further in this matter, Mr. Kessler?

4            MR. KESSLER:  No, your Honor.

5            THE COURT:  Mr. Fisher?

6            MR. FISHER:  No, your Honor.

7            THE COURT:  Mr. Fein, work with your mental health

8    professionals, sir.

9            Good luck to you.

10           Defendant is remanded to the custody of the marshal

11   for execution of sentence.

12           COURT CLERK:  All rise, please.

13           Court is in recess.

14       (At 10:03 a.m., proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

1
2
3                    C E R T I F I C A T E
4
5       I, Kathleen S. Thomas, Official Court Reporter for the
6  United States District Court for the Western District of
7  Michigan, appointed pursuant to the provisions of Title 28,
8  United States Code, Section 753, do hereby certify that the
9  foregoing is a true and correct transcript of proceedings
10  had in the within-entitled and numbered cause on the date
11  hereinbefore set forth; and I do further certify that the
12  foregoing transcript has been prepared by me or under my
13  direction.
14
15
16                    /s/
17       _____
18       Kathleen S. Thomas, CSR-1300, RPR
         U.S. District Court Reporter
         410 West Michigan
19       Kalamazoo, Michigan   49007
20
21
22
23
24
25